Affirmed and Memorandum Opinion filed January 11, 2011.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00970-CR

___________________

 

Timothy Wayne Shepherd, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 183rd District Court

Harris County,
Texas



Trial Court Cause No. 1108994

 



 

 

MEMORANDUM OPINION

Appellant, Timothy Wayne Shepherd,
appeals his conviction for murder.  Tex. Penal Code Ann. § 19.02 (West 2003). 
Finding no error, we affirm.

Factual and Procedural Background

            While 16 years
old, the complainant, Tynesha Stewart, met and began dating appellant, then 24
years old.  The relationship grew more serious and Stewart eventually rented an
apartment in which they both lived.  In 2006, Stewart was accepted into Texas A
& M University and she started her freshman year that August.

            During Stewart’s
first semester at Texas A & M, appellant called Stewart’s dorm or cellular
telephone several times daily.  Many of Stewart’s telephone conversations with
appellant were unpleasant.  When Stewart returned home following the end of her
first semester, witnesses reported that she appeared more social and started
talking to a student at another college named Mark.  For a brief time,
appellant’s telephone calls ceased.  However, by February 2007, appellant began
calling Stewart again.  As Stewart’s spring break approached, she expressed
concern about going home to Houston.  Stewart stated she feared appellant would
follow her around.  

            Despite her
concern over appellant’s behavior, Stewart returned to Houston for her spring
break.  Once back in Houston, Stewart made plans with friends to attend a
concert at the Houston Livestock Show and Rodeo on Thursday, March 15, 2007. 
In addition, Stewart made plans to travel to Padre Island for the last part of
her spring break.

On March 14, Stewart visited with Mark and other
friends and then went to the apartment of her friend Lois Greenwood.  Appellant
picked Stewart up from that apartment early on the morning of March 15. 
Stewart left without her cellular telephone and told Greenwood she would return
later that day.  Stewart never returned to Greenwood’s apartment.  Stewart did
not show up for the concert.  When Stewart did not return to Greenwood’s
apartment, Greenwood eventually contacted Stewart’s family.  It was later determined
that Stewart’s younger sister was the last to speak with Stewart at about noon on
March 15; at that time, she learned Stewart was with appellant.  

James Hebert was appellant’s neighbor.  Hebert
testified during appellant’s trial that he saw Stewart for the last time on
March 15, when she was walking up the stairs to appellant’s apartment.  Herbert
told the jury that he and appellant frequently barbecued together and he had
loaned appellant his barbecue grill.  Hebert also testified that within a day
or so after he last saw Stewart, appellant began barbecuing on his patio. 
According to Hebert, appellant was barbecuing day and night, which was unusual
for appellant.  When Hebert inquired if appellant would give him some of the
barbecue, appellant refused, saying the barbecue was for a wedding.  Herbert
testified this was unusual as appellant normally shared his barbecue.  Hebert
also testified that eventually the fire in appellant’s barbecue grill, which
was on appellant’s second floor apartment patio, got out of control and Hebert’s
girlfriend called the fire department.  Herbert further testified that he
watched as the police and firefighters arrived and that appellant did not look as
though he wanted them inside his apartment, but he eventually allowed them in. 


Robert Logan, a Ponderosa Fire Department volunteer
firefighter, and Deputy Russell of the Harris County Sheriff’s Department, both
testified at trial about responding to the fire on appellant’s patio.  Logan
testified that appellant was initially reluctant to let them in the apartment. 
He also testified that once he got inside the apartment, he did not find a fire. 
Both Logan and Russell testified regarding meat they observed in appellant’s
apartment.  They found meat in appellant’s bathtub.  According to Logan, there
were some rib bones and two other small pieces of meat about the size of his
hand floating in clear water in the tub.  Russell testified he saw a rack of
ribs and two small chickens floating in the tub.  In addition to the meat
floating in the tub, Russell testified he saw three small burned chickens
sitting on the stove in appellant’s kitchen.  According to Russell, one of the
chickens was still smoking.  Russell testified he did not see anything in the
apartment that he considered unusual as he had “seen people do that before in
the areas that [he has] worked.”  

The following Monday, March 19, Harris County
Sheriff’s Deputy Wallace Wyatt, Stewart’s mother, Gayle Shields, and Greenwood
went to appellant’s apartment.  After appellant answered the door, Deputy Wyatt
questioned appellant regarding Stewart’s whereabouts.  Appellant told Deputy
Wyatt that she had been there last Thursday, but they argued over her having a
new boyfriend and that she had left the apartment, walking.  Deputy Wyatt then
asked appellant if he could look around the apartment.  Appellant consented. 
Deputy Wyatt testified that the apartment was dirty and he noticed an area with
new, white paint, but otherwise nothing stood out as indicating any criminal
activity.

Soon after this initial contact with appellant, a
search began for Stewart.  A headquarters for the search was set up at Abiding
Word Church.  On March 20, 2007, Sergeant Yvonne Cooper of the Harris County
Sheriff’s Department, was dispatched to the church, arriving about 6:10 p.m. 
Upon arriving, she learned appellant was on his way to the church.  Sergeant
Cooper wanted to interview appellant because he was the last person to see
Stewart.  When appellant arrived, Sergeant Cooper placed him in her patrol car
for his own protection from the gathering crowd.  Sergeant Cooper asked
appellant if he was willing to provide a written statement and he agreed to do
so.  However, when asked if he would consent to a search of his apartment and
vehicle, appellant refused.  Before appellant was driven to the Harris County
Sheriff’s Department Homicide Division offices, Sergeant Cooper obtained the
keys to appellant’s apartment and car.

Appellant arrived at the Homicide Division about 8:30
p.m., where he was interviewed by Sergeant Craig Clopton.  Once he spoke with
Sergeant Clopton, appellant consented to a search of his apartment and car.  Sergeant
Clopton then notified Sergeant Cooper and she, along with two other detectives,
searched appellant’s apartment.  During the search, the detectives looked for
any evidence suggesting that foul play had occurred in the apartment.  They
noted freshly painted areas in the apartment, which is an indicator that
evidence may have been covered up.  The detectives also conducted presumptive
blood tests which returned positive results behind the bathroom light switch,
the base of the toilet, and the western edge of the tub.

On March 21, Quanell X Farrakhan (“Quanell X”), the
leader of The New Black Panthers and The New Black Muslim Movement got involved
in the search for Stewart.  While meeting with Stewart’s family, Quanell X
received a telephone call from appellant and he agreed to meet with appellant. 
Quanell X met appellant at a nearby motel and instructed appellant to get into his
car.  They then travelled to appellant’s apartment.  Concerned the police might
have planted listening devices, Quanell X and appellant went into the apartment
bathroom.  Inside the bathroom, appellant became visibly more nervous.  Quanell
X asked appellant, “… are you sure you do not know what happened to this
sister?”  At that point appellant said he did not want to talk in the bathroom
and asked if they could leave the apartment and talk outside. 

Quanell X and appellant left the apartment and walked
toward the apartment complex’s tennis courts.  As they walked, appellant
stated: “[m]an they going to kill me.  They going to give me the death
penalty.”  To ease his concerns about the death penalty, Quanell X suggested
appellant speak to his attorney, Stanley Schneider.  After a telephone
conversation with Schneider, appellant appeared more comfortable and agreed to
take Quanell X to where he had placed Stewart.

At that point, Quanell X contacted the Sheriff’s
Department and they dispatched Sergeant Miller to accompany appellant and Quanell
X.  When Sergeant Miller arrived and got into Quanell X’s car, appellant
directed them to another apartment complex.  Once inside that complex, they
travelled to the back toward a trash dumpster.  The three men exited the car
and walked up to the dumpster where Quanell X asked appellant: “Tim, is this
where you put her?”  Appellant answered “[y]es.”  Sergeant Miller then placed
appellant under arrest.[1]

Appellant was taken to the Harris County Homicide
Division where he was placed in an interview room.  Once appellant was in the interview
room, Sergeant Miller took photographs to document any injuries appellant may
have had when he was brought into custody.  At that point in time, appellant
pointed out a small cut on one of his fingers, which Sergeant Miller
photographed.

After being photographed, appellant informed Sergeant
Miller that he wanted to speak to his attorney, Stan Schneider.  When Schneider
arrived outside the Homicide Division offices, Assistant District Attorney
Kelly Siegler informed Schneider that he could not consult with appellant or
represent appellant because there was a conflict of interest since Schneider
represented Quanell X.  Despite that comment by Siegler, Schneider was allowed
to briefly meet with appellant.  After that meeting, appellant agreed to give his
statement to the detectives.  During that statement, appellant confessed to
killing Stewart.[2]

Following appellant’s confession, the detectives
obtained a search warrant and searched appellant’s apartment again.  During
this search, the detectives seized, among other items, the drain traps and the
garbage disposal.

During the guilt-innocence phase of appellant’s
trial, DNA analyst Nikki Redmond testified.  Redmond testified that she tested
blood found on a pair of jeans seized from appellant’s apartment.  Redmond
testified that the blood revealed a DNA profile consistent with appellant and
that Stewart could not be excluded as a possible minor contributor to the
mixture.  Redmond also testified regarding several pieces of bone and enamel that
had been located inside the garbage disposal.  DNA testing revealed that
Stewart could not be excluded as a possible contributor and appellant could be
excluded as a possible contributor to the DNA obtained in relation to State’s
exhibit 167-A , one of the items found in appellant’s garbage disposal.

The State also called forensic anthropologist Dr.
Jennifer Love to testify as an expert regarding bone trauma and toolmarks found
on bone fragments collected below appellant’s apartment patio.  Dr. Love
testified that she is employed by the Harris County Medical Examiner’s Office. 
Dr. Love testified regarding her qualifications, which included master’s and
doctoral degrees in physical anthropology.  While studying for those degrees,
Dr. Love also received training in toolmark analysis.  Dr. Love also testified
that she had worked as a forensic anthropologist since 2003, including working
for two years under Dr. Steve Sims, the most respected anthropologist in terms
of toolmark analysis, at the Shelby County Medical Examiner’s Office in Memphis,
Tennessee.

After testifying on her qualifications, Dr. Love
explained that forensic anthropology is the application of physical
anthropology, which is the study of the human skeleton, to medical-legal
cases.  Dr. Love also explained that a toolmark is a mark left on bone by an
instrument such as a saw or a knife.  Dr. Love explained that “toolmark
analysis is a morphological study.  It is not a test study such as you have
with chemistry or DNA.  …[I]t is a descriptive analysis.”  In addition, Dr.
Love explained that it is possible to differentiate between human bones and
animal bones.  Dr. Love testified that it is easy to tell the difference when
one examines a complete bone, however it becomes more difficult when dealing
with bone fragments.  When examining bone fragments, one looks for features
such as the thickness of the cortical bone or the pattern of the sponginess in
trabecular bones to determine whether the fragment is more likely a human or
non-human bone.[3]
 During her testimony, Dr. Love discussed the differences between antemortem
trauma to bones versus perimortem trauma.[4] 
Dr. Love went on to describe the effect burning has on bones and the
differences between blunt force trauma to bones and thermal trauma to bones.

Dr. Love then testified about specific bone fragment
exhibits in this case, which consisted of photographs of the fragments.  Dr.
Love opined that the fragments had been cut with some type of saw at or near
the time of death and then they had been burned.  While Dr. Love could not
testify to a reasonable degree of scientific certainty that the bone fragments
were human, she did testify the fragments had characteristics that were
consistent with being from a human forearm bone.

At the close of the evidence, the case was submitted
to the jury, which found appellant guilty.  The case then proceeded to the
punishment phase where appellant testified.

During his testimony, appellant admitted he got into
an argument with Stewart over her dating Mark and that he strangled her to
death.  Appellant then testified that he panicked and “decided that [he] needed
to cover up [his] tracks.”  Initially, appellant testified that he went to a
nearby hardware store where he bought an electric jigsaw.  Appellant then
explained he placed Stewart’s body in his apartment’s bathtub and then
dismembered her body using the jigsaw.  Using a pair of pliers, appellant
pulled out all of Stewart’s teeth, which he then burned in his smoker grill on
his patio along with some of Stewart’s body parts.  Appellant placed the
remaining body parts in a plastic box, which he slid down the stairs, loaded in
his car, and eventually threw in an apartment dumpster.  After he disposed of
Stewart’s body, appellant proceeded to burn the clothes and shoes he had been
wearing, as well as Stewart’s clothing.

The jury assessed appellant’s punishment at
ninety-nine years’ confinement in the Institutional Division of the Texas
Department of Criminal Justice.  This appeal followed.

Discussion

            Appellant brings
five issues on appeal.  We address them in order.

I.         Did the trial
court err when it denied appellant’s motion to suppress because the State did
not exhibit the search warrant to the trial court?

            Prior to his
trial, appellant filed a motion to suppress evidence he contends was unlawfully
seized from his apartment pursuant to a tainted search warrant.  In his first
issue, appellant asserts the trial court erred when it denied his motion to
suppress because “the State failed to exhibit the contested search warrant and
affidavit in support of said warrant to the trial judge.”

            Appellant filed a
motion to abate this appeal so the trial court could hold a hearing to determine
whether the search warrant and accompanying affidavit were admitted into
evidence or admitted into evidence for a limited purpose and to order that a
true and correct copy of the search warrant and accompanying affidavit be
admitted into evidence for a limited purpose.  We then abated this appeal and
ordered the trial court to hold such a hearing.

That hearing was held on September 10, 2009.  During
the hearing, the trial court determined that the search warrant and its
contents were addressed and litigated throughout the suppression hearing and
the trial.  The trial court also determined that the search warrant and
accompanying affidavit were admitted for the purposes of the suppression
hearing only.  The trial court then ordered that a true and correct copy of the
search warrant and accompanying affidavit be included in a supplemental clerk’s
record which was subsequently filed with this court.  Appellant’s appellate
counsel was present at the abatement hearing and lodged no objection to the
trial court’s handling of the matter.

We conclude appellant’s first issue is without merit,
and we overrule it.

II.        Did the trial
court err when it denied appellant’s request for a self-defense instruction in
the jury charge?

            In his second
issue on appeal, appellant contends the trial court committed reversible error
when it denied his request for a jury charge instruction on self-defense.

            A.        The
law applicable to self-defense.

            A defendant is
entitled to an instruction on self-defense if the issue is raised by the evidence,
whether that evidence is strong or weak, regardless of what the trial court may
think about the credibility of the defense.  Ferrel v. State, 55 S.W.3d
586, 591 (Tex. Crim. App. 2001); Granger v. State, 3 S.W.3d 36, 38 (Tex.
Crim. App. 1999).  Before a defendant is entitled to a self-defense instruction,
however, there must be some evidence, when viewed in the light most favorable
to the defendant, that will support the claim.  Ferrel, 55 S.W.3d at
591.  A defendant need not testify in order to raise a defense.  Boget v.
State, 40 S.W.3d 624, 626 (Tex. App.—San Antonio), aff’d, 74 S.W.3d
23, 31 (Tex. Crim. App. 2001).

Entitlement to a self-defense instruction is
predicated on the provision of some evidence that the defendant was authorized
to utilize force against another.  “[A] defense is supported (or raised) by the
evidence if there is some evidence, from any source, on each element of the
defense that, if believed by the jury, would support a rational inference that
that element is true.”  Shaw v. State, 243 S.W.3d 647, 657–58 (Tex.
Crim. App. 2007).  Section 9.32 of the Texas Penal Code provides:

(a)       A person is justified in using deadly force
against another:

(1)       if
the actor would be justified in using force against the other under Section
9.31;[5]
and 

(2)       when
and to the degree the actor reasonably believes the deadly force is immediately
necessary:

(A)      to
protect the actor against the other’s use or attempted use of unlawful deadly
force; or

(B)      to
prevent the other’s imminent commission of aggravated kidnapping, murder,
sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

(b)       The
actor’s belief under Subsection (a)(2) that the deadly force was immediately
necessary as described by that subdivision is presumed to be reasonable if the
actor:

(1)       knew
or had reason to believe that the person against whom the deadly force was
used:

(A)      unlawfully
and with force entered, or was attempting to enter unlawfully and with force,
the actor’s occupied habitation, vehicle, or place of business or employment;

(B)      unlawfully
and with force removed, or was attempting to remove unlawfully and with force,
the actor from the actor’s habitation, vehicle, or place of business or
employment; or

(C)      was
committing or attempting to commit an offense described by subsection
(a)(2)(B);

(2)       did not provoke the person against whom the
force was used; and

(3)       was
not otherwise engaged in criminal activity, other than a Class C misdemeanor
that is a violation of a law or ordinance regulating traffic at the time the
force was used.

(c)       A
person who has a right to be present at the location where the deadly force is
used, who has not provoked the person against whom the deadly force is used,
and who is not engaged in criminal activity at the time the deadly force is
used is not required to retreat before using deadly force as described by this
section.

(d)       For
purposes of Subsection (a)(2), in determining whether an actor described by
Subsection (c) reasonably believed that the use of deadly force was necessary,
a finder of fact may not consider whether the actor failed to retreat.

 Tex. Penal Code Ann. § 9.32
(West Supp. 2009).  If the evidence, viewed in the light most favorable to the
defendant, does not establish self-defense, the defendant is not entitled to an
instruction on the issue.  Ferrel, 55 S.W.3d at 591.

            B.        Appellant
did not establish all elements of the defense of self-defense.

            Appellant argues
there was evidence presented during the guilt-innocence phase of his trial that
he acted in self-defense and, therefore, the trial court should have included
his requested self-defense instruction in the charge.  Appellant relies on a
single exhibit, the photograph taken by Sergeant Miller when appellant was
taken into custody that shows a cut on one of appellant’s fingers, and Sergeant
Miller’s testimony regarding that photograph:

[Prosecutor]: Did you notice any injuries on [appellant]
March 21st when you took him into the Lockwood substation?

[Miller]:         He said that he had a cut on his right
finger which I took a picture of it.

…

[Defense Attorney]: Sergeant Miller, would you agree with
me based on your training and experience that the type of cut depicted in
State’s Exhibit 267 would be consistent with what we call a defensive wound?

[Miller]:         I would agree with that.

Appellant asserts the only reasonable inference from
the photograph and the testimony quoted above is that appellant sustained the
cut while defending himself from Stewart’s aggression.  We disagree that, even
when viewed in the light most favorable to appellant, that the only reasonable
inference from this evidence was that Stewart attacked appellant which required
him to use deadly force to protect himself.  In addition, even if we were to
accept appellant’s invitation and infer from this evidence that Stewart cut
appellant’s finger, the evidence does not establish all of the elements of the
defense of self-defense.  For example, the mere existence of a cut on
appellant’s finger does not establish that appellant reasonably believed that
the use of deadly force was immediately necessary to protect appellant from
Stewart’s use or attempted use of unlawful deadly force.  See Tex. Penal
Code Ann. § 9.32(a)(2).  Appellant’s cut finger also does not establish (1)
that appellant did not provoke Stewart, or (2) that appellant was not engaged
in criminal activity at that point in time.  See id. § 9.32(b)(2) &
(3).

Because the evidence cited by appellant does not
establish each element of the defense, we hold the trial court did not err when
it denied appellant’s request for a self-defense instruction in the jury charge.
 See Shaw, 243 S.W.3d at 657–58; see Davis v. State, 268
S.W.3d 683, 697–98 (Tex. App.—Fort Worth 2008, pet. ref’d) (holding that a
doctor’s testimony that a cut on the defendant’s ear was not a self-inflicted
wound did not entitle the defendant to a self-defense instruction because he
did not present evidence on all elements of the defense).  We overrule
appellant’s second issue.

III.      Did the trial
court abuse its discretion when it admitted the expert testimony of forensic
anthropologist Dr. Jennifer Love?

            Rule 702 of the
Texas Rules of Evidence provides: “If scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.”  Tex. R. Evid. 702.  Pursuant to Rule 702, the trial
court, before admitting expert testimony, must be satisfied that three
conditions are met: (1) that the witness qualifies as an expert by reason of
his knowledge, skill, experience, training, or education; (2) that the subject
matter of the testimony is appropriate for expert testimony; and (3) that
admitting the expert testimony will actually assist the fact finder in deciding
the case.  Vela v. State, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). 
These conditions are commonly referred to as (1) qualification, (2)
reliability, and (3) relevance.  Id.

In his third issue, appellant challenges the trial
court’s decision to admit the testimony of forensic anthropologist Dr. Jennifer
Love regarding the science of toolmark analysis and its application to the
facts and evidence in this case.  Specifically, appellant argues the State
failed to meet its burden to establish that (1) Dr. Love was qualified; (2) her
opinion was reliable; and (3) her opinion was relevant.  In addition, appellant
contends the trial court abused its discretion when it permitted Dr. Love to
testify because the probative value of her testimony was substantially
outweighed by the danger of unfair prejudice in violation of Rule 403 of the
Texas Rules of Evidence.  We address each contention in turn.

A.        The standard of review.

We use the abuse of discretion standard to review a
trial court’s decision on whether to allow expert testimony.  Gallo v. State,
239 S.W.3d 757, 765 (Tex. Crim. App. 2007).  Before reversing the trial court’s
decision, we must find the trial court’s ruling was so clearly wrong as to lie
outside the realm within which reasonable people might disagree.  Taylor v.
State, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); Green v. State,
191 S.W.3d 888, 895 (Tex. App.—Houston [14th Dist.] 2006, pet. ref’d).  Absent
a clear abuse of that discretion, the trial court’s decision to admit or
exclude expert testimony will not be disturbed.  Wyatt v. State, 23
S.W.3d 18, 27 (Tex. Crim. App. 2000).  Such rulings will rarely be disturbed on
appeal.  Vela, 209 S.W.3d at 136.

B.        The law applicable to expert
qualifications.

            Qualification is
distinct from reliability and relevance and should be evaluated independently. 
Id. at 131.  The proponent of the expert testimony bears the burden of
proving that the expert is qualified.  Turner v. State, 252 S.W.3d 571,
584 (Tex. App.—Houston [14th Dist.] 2008, pet. ref’d).

The specialized knowledge which qualifies a witness
to give an expert opinion may be derived from specialized education, practical
experience, a study of technical works, or a varying combination of these
things.  Id. at 585.  This specialized knowledge possessed by the expert
must be beyond that possessed by the average person, “but the gap need not
necessarily be monumental.”  Davis v. State, 313 S.W.3d 317, 350 (Tex.
Crim. App. 2010).  In addition, the expert’s background must be tailored to the
specific area of expertise about which he intends to testify.  Vela, 209
S.W.3d at 133.  In other words, to determine whether an expert witness is
qualified to testify, the trial court must consider whether the witness has a sufficient
background in a particular field and whether that background goes to the very
matter on which the witness is to give an opinion.  Id.  Because the
possible spectrum of education, skill, and training is so wide, a trial court
has great discretion in determining whether a witness possesses sufficient
qualifications to assist the jury as an expert.  Rodgers v. State, 205
S.W.3d 525, 527–28 (Tex. Crim. App. 2006).    

            C.        Dr.
Love was qualified to testify as an expert. 

            The State’s
evidence in qualifying Dr. Love as an expert in the area of bone trauma and
toolmark analysis established that she held a master’s and a doctoral degree in
physical anthropology.[6] 
Dr. Love also explained that physical anthropology is the study of the human
skeleton.  Dr. Love testified that she has worked as a forensic anthropologist
since 2003 and has been employed as the forensic anthropology director at the
Harris County Medical Examiner’s Office since 2006.  According to Dr. Love,
forensic anthropology takes the methods of physical anthropology and applies
them to individuals in medical-legal cases instead of to the entire population.

Turning specifically to toolmark analysis, Dr. Love
testified that the science of toolmark analysis is recognized by the scientific
community and there have been articles published on toolmark analysis since the
early 1970’s.  Dr. Love testified that the science of toolmark analysis has
been recognized as reliable by the scientific community.  Dr. Love went on to summarize
what is meant by the term toolmark:

Toolmark analysis is a morphological study.  It is not a
test study such as you have with chemistry or DNA.  So, it is a descriptive
analysis.  There are parameters that are published that are met to show that it
is, in fact, a toolmark such as what we talk about in this case.  The width of
the — the width of the mark, the depth of the mark, the formation of the floor
of the mark also we’ll see that— so we have the mark, the partial mark. 
Immediately to the right of the partial mark is a complete mark.  And there are
regular striations — or irregular striations but steps in that mark which is
also characteristic of a toolmark.  So, when these established characteristics
are identified, then it can be considered a toolmark.

Dr. Love also testified that as part of her education
and training as a physical anthropologist, she received training and education
in identifying toolmarks.  While Dr. Love did testify that there is no
recognized proficiency testing in toolmark analysis, she explained that she
took coursework on that subject.  In those courses, Dr. Love explained,she had
to frequently present her knowledge and ability to identify toolmarks in order
to pass.

Dr. Love also testified that she worked for several
years with Dr. Steve Sims, who was the head forensic anthropologist at the
Shelby Coundy Medial Examiners Office in Memphis, Tennessee.  According to Dr.
Love, Dr. Sims was the leading anthropologist in the field of toolmark
analysis.[7]
 While she worked with Dr. Sims, he received cases from throughout the United
States and Canada and she worked with him on those cases.  Dr. Love explained
that while she worked with Dr. Sims, he reviewed and approved all of her work,
including work involving toolmark analysis.

Finally, Dr. Love testified that she has appeared as
an expert in court many times on the subjects of both bone trauma and toolmark
analysis.

Based on the above, we
conclude Dr. Love established that she had specialized knowledge, training, and
experience in toolmark analysis and that knowledge went to the very matter on
which she was asked to render an opinion in this case.  Therefore, we hold the
trial court did not clearly abuse its discretion when it overruled appellant’s
objection based on Dr. Love’s qualifications.

D.        Dr. Love’s testimony
was both reliable and relevant.

            Texas
Rule of Evidence 705(c) governs the reliability of expert testimony and states
that “[i]f the court determines that the underlying facts or data do not
provide a sufficient basis for the expert’s opinion under Rule 702 or 703, the
opinion is inadmissible.”  Tex. R. Evid. 705(c).  To be considered reliable,
evidence from a scientific theory must satisfy three criteria: “(a) the
underlying scientific theory must be valid; (b) the technique applying the
theory must be valid; and (c) the technique must have been properly applied on
the occasion in question.”  Coble v. State, No. AP-76,019, 2010WL3984713,
at *10 (Tex. Crim. App. October 13, 2010) (quoting Kelly v. State, 824
S.W.2d 568, 573 (Tex. Crim. App. 1997)).  When “soft” sciences are at issue, the
trial court must inquire “(1) whether the field of expertise is a legitimate
one, (2) whether the subject matter of the expert’s testimony is within the
scope of that field, and (3) whether the expert’s testimony properly relies
upon and/or utilizes the principles involved in the field.”  Id.
(quoting Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998)). 
This inquiry is somewhat more flexible than the factors, outlined in Kelly
v. State, applicable to the hard sciences.[8] 
Id.  The general principles announced in Kelly apply, but the
specific factors outlined in those cases may, or may not apply depending upon
the context.  Id.  Regardless, under both Kelly and Nenno,
reliability should be evaluated by reference to the standards applicable to the
particular professional field in question.  Id. 

            Evidence
is relevant if it has any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable
than it would be without the evidence.  Tex. R. Evid. 401.  To be relevant,
evidence must be both material and probative.  Miller v. State, 36
S.W.3d 503, 507 (Tex. Crim. App. 2001).  To be material, the evidence must be
addressed to the proof of a fact of consequence to the determination of the
action.  Id.  To be probative, the proffered evidence must make the
evidence of the fact more or less probable than it would be without the
evidence.  Id.

            Since
Stewart’s remains were not recovered and the State elected not to use
appellant’s confession during the guilt/innocence phase of the trial, the State
needed to provide the jury with evidence that Stewart was in fact dead and not
just missing.  The State called Dr. Love for that purpose.

After she had testified
about her qualifications, Dr. Love explained the limits on differentiating
between human bones and animal bones as well as the differences between
antemortem trauma to bones versus perimortem trauma.  In addition, Dr. Love
testified about the effect burning has on bones and the noticeable differences
between blunt force bone trauma and thermal bone trauma.  Dr. Love also
explained the methods used when performing a toolmark analysis.

Dr. Love then turned her
attention to the bone fragments found on the ground outside appellant’s
apartment.  Initially, Dr. Love testified that the bone fragments were too
small or badly burned to obtain any DNA.  She then described the bone trauma
and toolmarks found on those bone fragments.  Dr. Love opined that the
toolmarks on the bone fragments were consistent with being made by either a
hunting knife or a saw.  In addition, Dr. Love opined that the bone fragments
had characteristics consistent with being human and showed no signs of healing,
indicating that the cuts occurred at or near the time of death.

            Based
on the above, we conclude Dr. Love’s testimony was reliable.  In addition, we
hold Dr. Love’s testimony was relevant as it provided some evidence proving the
State’s theory of the case: that appellant had killed Stewart, that he had then
dismembered her body using a knife and/or a saw, and had then burned some or
all of her body in an effort to conceal his crime.

            E.        Was
the probative value of Dr. Love’s testimony substantially outweighed by the
danger of unfair prejudice?

            In
the final part of his third issue, appellant asserts the trial court’s decision
to admit Dr. Love’s testimony violated Rule 403 because the bone fragments she
testified about were never identified as Stewart’s or even human.  According to
appellant, this made Dr. Love’s testimony “nothing more than inflammatory
testimony designed to rile the jurors” and would induce them to rely on emotion
rather than the facts when deciding appellant’s guilt or innocence.

A trial court’s ruling
whether to exclude evidence under Rule 403 of the Texas Rules of Evidence is
measured by an abuse of discretion standard and will not be reversed if the
ruling is within the zone of reasonable disagreement.  Andrade v. State,
246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007, pet. ref’d).

Evidence is relevant if it has any tendency to make
the existence of any fact of consequence to the determination of the action
more probable or less probable than it would be without the evidence.  Tex. R.
Evid. 401.  Relevant evidence may be excluded by the trial court under Rule 403
“if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative
evidence.”  Tex. R. Evid. 403.  Rule 403 favors the admission of relevant
evidence and carries a presumption that relevant evidence will be more
probative than prejudicial.  Andrade, 246 S.W.3d at 227.  In conducting
a Rule 403 analysis, a trial court must balance (1) the inherent probative
force of the proffered item of evidence along with (2) the proponent’s need for
that evidence against (3) any tendency of the evidence to suggest a decision on
an improper basis, (4) any tendency of the evidence to confuse or distract the
jury from the main issues, (5) any tendency of the evidence to be given undue
weight by a jury that has not been equipped to evaluate the probative force of
the evidence, and (6) the likelihood that the presentation of the evidence will
consume an inordinate amount of time or repeat evidence already admitted.  Casey
v. State, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007).

a.         Probative Force and Need for the
Evidence

We begin with an evaluation of the probative value of
Dr. Love’s testimony; that is, the inherent probative force of the evidence
coupled with the proponent’s need for that item of evidence.  Id. at
879.  Probative force refers to how strongly the evidence serves to make more
or less probable the existence of a fact of consequence to the litigation.  Id. 
Here, the State utilized Dr. Love’s testimony to tie together the many pieces
of evidence that came from many different sources to establish that Stewart was
indeed dead, that she had died in appellant’s apartment, and that she had been
killed, dismembered, and burned by appellant.  We conclude that Dr. Love’s
testimony was highly probative and the State’s need for the testimony was great.

b.         Rule 403 Counterfactors

We now turn to balancing the probative value of Dr.
Love’s testimony against the Rule 403 counterfactors.  Casey, 215 S.W.3d
883.

1.         Potential to Impress the Jury to Decide
on Improper Basis

We begin by examining whether the contested testimony
has the potential to impress the jury in an irrational but indelible way.  Andrade,
246 S.W.3d at 228.  Rule 403 does not exclude all prejudicial evidence.  It
focuses only on the danger of unfair prejudice.  State v. Mechler, 153
S.W.3d 435, 440 (Tex. Crim. App. 2005).  Unfair prejudice refers only to
relevant evidence’s tendency to tempt the jury into finding guilt on grounds
apart from the proof of the offense charged.  Id.  The prejudicial
effect may be created by the tendency of the evidence to prove some adverse
fact not properly in issue or unfairly to excite emotions against the
defendant.  Appellant’s argument is based on the latter.  However, Dr. Love’s testimony
was not inflammatory as it was introduced to prove that Stewart was dead and
what happened to her body, and it did so in a straightforward manner not designed
to influence the jury in an emotional manner.  We conclude Dr. Love’s testimony
did not have a great potential to impress the jury in an irrational way and
would not tempt them into finding guilt on improper grounds.  See Santellan
v. State, 939 S.W.2d 155, 169–70 (Tex. Crim. App. 1997) (holding that
admission of evidence of abuse of a corpse did not violate Rule 403 as it was
vitally important to proving prosecution’s case).  This factor does not weigh
against the admission of Dr. Love’s testimony. 

2.         Likelihood of Confusion of the Issues

Next, we inquire as to the tendency of the evidence
to confuse or distract the jury from the main issues.  See Casey, 215
S.W.3d at 880.  Because Dr. Love’s evidence directly addressed the issue of
whether Stewart was dead and what had happened to her body, facts essential to
proving the charged offense, we conclude it could not confuse or distract the
jury from the issue before them.  This factor does not weigh against admitting Dr.
Love’s testimony.

3.         Danger of Misleading the Jury

Third, we examine any tendency of the challenged testimony
to be given undue weight by a jury on any basis other than emotional grounds.  Gigliobianco
v. State, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).  “For example,
‘scientific’ evidence might mislead a jury that is not properly equipped to
judge the probative force of the evidence.”  Id.  Here, we conclude this
factor actually weighs in favor of the admission of Dr. Love’s testimony as she
provided key evidence proving that Stewart was dead.  The fact her testimony
addressed a particularly gruesome crime does not make it overly inflammatory or
likely to mislead the jury.  This factor does not weigh against admission.

4.         Risk of Undue Delay

Finally, we examine the
likelihood that Dr. Love’s testimony consumed an inordinate amount of time or
merely repeated evidence already admitted.  Id. at 642.  This factor
concerns the efficiency of the trial proceeding rather than the threat of an
inaccurate decision.  Id. at 641.  The time involved in presenting Dr.
Love’s testimony to the jury was minimal when compared to the whole trial as it
runs a mere 47 pages out of a reporter’s record that covers 19 volumes[9] totaling 2,841
pages.  In addition, many of the 47 pages were consumed by argument to the
bench regarding the admissibility of Dr. Love’s testimony.  We also conclude
the evidence was not cumulative of other evidence as it tied together much of
the other evidence to establish that appellant had killed Stewart inside his
apartment, dismembered her body, and then burned all or some part of it in his
barbecue grill on his apartment’s patio.  We conclude this factor also does not
weigh against admission of Dr. Love’s testimony.

  Having considered all of the Rule 403 factors, we hold
the trial court did not abuse its discretion when it denied appellant’s Rule
403 challenge and permitted Dr. Love to testify.

            Having
addressed, and rejected each of appellant’s arguments found in his third issue,
we overrule appellant’s third issue on appeal.

IV.      Is
the evidence legally and factually sufficient to support the conviction?

            In
his fourth issue, appellant contends the evidence is both legally and factually
insufficient to support his conviction.  We disagree.

            A.        The
standard of review.

            A
majority of the judges of the Texas Court of Criminal Appeals have determined
that “the Jackson v. Virginia legal-sufficiency standard is the only
standard that a reviewing court should apply in determining whether the
evidence is sufficient to support each element of a criminal offense that the
State is required to prove beyond a reasonable doubt.”  Brooks v. State,
323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.).[10]  Therefore, in
this case, we do not separately refer to legal or factual sufficiency.

In a sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.
2781, 2789, 61 L. Ed. 2d 569 (1979); Salinas v. State, 163 S.W.3d 734,
737 (Tex. Crim. App. 2005).  The jury, as the sole judge of the credibility of
the witnesses, is free to believe or disbelieve all or part of a witness’
testimony.  Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). 
The jury may reasonably infer facts from the evidence presented, credit the
witnesses it chooses to, disbelieve any or all of the evidence or testimony
proffered, and weigh the evidence as it sees fit.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).  Reconciliation of conflicts in the evidence
is within the jury’s discretion, and such conflicts alone will not call for
reversal if there is enough credible evidence to support a conviction.  Losada
v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).  An appellate court
may not re-evaluate the weight and credibility of the evidence produced at
trial and in so doing substitute its judgment for that of the fact finder.  King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  Inconsistencies in
the evidence are resolved in favor of the verdict.  Curry v. State, 30
S.W.3d 394, 406 (Tex. Crim. App. 2000).  We do not engage in a second
evaluation of the weight and credibility of the evidence, but only ensure the
jury reached a rational decision.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d 775, 784 (Tex.
App.—Houston [14th Dist.] 2005, pet. ref’d).

B.        The evidence is sufficient to support
the conviction.

A person commits the offense of murder if he
intentionally or knowingly causes the death of an individual or intends to
cause serious bodily injury[11]
and commits an act clearly dangerous to human life that causes the death of an
individual.  Tex. Penal Code Ann. § 19.02(b)(1) & (2).  Appellant was
indicted for the murder of Stewart under both section 19.02(b)(1) and section
19.02(b)(2) by either a manner and means unknown to the jury or by cutting her
with a knife.  Each of these constitutes an alternative means of committing
murder and the jury could convict appellant under either of the theories.  See
id.; Aguirre v. State, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987) (“Because
appellant’s indictment did not allege different offenses but only alleged
different ways of committing the same offense, the court properly furnished the
jury with a general verdict form.”).  As the Court of Criminal Appeals has
consistently held, “[W]hen multiple theories are submitted to the jury, the
evidence is sufficient to support the conviction so long as the evidence is
sufficient to support conviction for one of the theories submitted to the
jury.”  Guevara v. State, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004)
(citing Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

The corpus delecti of murder is established if the
evidence shows the death of a human being caused by the criminal act of
another.  Fisher v. State, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993). 
The State may prove the corpus delecti by circumstantial evidence.  McDuff
v. State, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).  The State’s
inability to produce and identify the body or remains does not preclude a
murder conviction.  Id.  On appeal, appellant does not challenge the
evidence supporting the fact that Stewart was dead; instead, he focuses his
challenge on the argument that the jury had no evidence that a criminal act occurred
which caused Stewart’s death.  We disagree.

The State presented circumstantial evidence to
establish that appellant committed the criminal act of murder.  This evidence
begins with the fact that appellant and Stewart had a chaotic and violent
relationship.  One time Stewart called her sister crying and upset saying that
appellant had “become physical with her and had his hands around her neck…he
told her that he was going to kill her and that he was not going to let her out
of the apartment.”  One of Stewart’s sisters later observed finger marks on
Stewart’s neck.  When Stewart began seeing someone else while she was away at
college, appellant was not happy with this development.  The week of her
disappearance, while Stewart was home from college on spring break, appellant
and Stewart fought and he told her “he would have to get out of Texas before he
ended up killing her.”  In addition, the evidence shows that Stewart was picked
up by appellant early on the morning of March 15, 2007, and was never heard
from or seen again.

After Stewart had disappeared, appellant admitted to
being the last person to see her, claiming she left his apartment on foot after
they got into an argument about her new boyfriend.  The State then introduced evidence
from various witnesses of events that occurred in and around appellant’s
apartment after Stewart had disappeared.  This evidence included the following:

Even though the March weather was cool and pleasant,
appellant had his windows open, his patio door open, fans running in his
apartment, and his air conditioner on.

Water had run continuously at full blast in
appellant’s bathtub for hours.

A loud pounding noise occurred in appellant’s dining
room/kitchen area for at least a half hour.

Following the pounding, appellant’s garbage disposal
ran at least five minutes straight or long enough for his neighbors to notice
and find it “a little strange.”  

Appellant barbecued constantly for a couple of days
on his patio.
            Despite having his neighbor’s grill on his patio and despite
normally sharing his barbecue with his neighbor, the evidence shows that, on
this occasion, appellant told his neighbor he was cooking for a wedding and he
could not share.

The neighbor testified that he never saw his grill
again.  

Appellant told another neighbor he was barbecuing
“meat.”  

While appellant was barbecuing, his neighbors testified
they noticed a different color and smell to appellant’s grilling; that the
smoke was “not normal” and “dark,” and the smell was “rank,” “horrific,”
“foul,” “worse than like singed hair or tires.”

The evidence also shows that while appellant was
barbecuing, the fire got out of control and the fire department was called to
his apartment.  The firefighters who responded were reluctantly admitted into
appellant’s apartment to go to the patio to check on the fire.  The
firefighters observed the bathtub was partially filled with water and had meat
floating in it.  The meat appeared to be rib bones and two smaller pieces of
meat.  In addition, the firefighters saw what appeared to be burnt chicken or Cornish
game hens on the stove in appellant’s kitchen.

The evidence also reveals that, after the
firefighters left, appellant continued barbecuing and the smell was the same as
before.

During the same time, the evidence shows that one of
appellant’s neighbors smelled ammonia from appellant’s apartment and that appellant
would not allow her inside his apartment to use his phone when it was customary
for him to do so.

The evidence demonstrates that within three days of
Stewart’s disappearance, appellant was seen carrying trash bags with “box
shaped objects” inside to his car, and appellant threw away both grills,
including the grill that did not belong to him.

Stewart’s mother and sister arrived at appellant’s
apartment along with a Harris County Deputy several days after anyone had last
heard from Stewart.  Appellant allowed the deputy to do a walk-through of his
apartment where the deputy observed areas with fresh paint or primer. 
Appellant called another of Stewart’s sisters angry that Stewart’s parents had
shown up with cameras and thinking that he had “cut her up and put her in my
wall.”

Eventually a search was organized to look for
Stewart.  The searchers set up at a church near appellant’s apartment.  While
appellant never participated in the search activities, he was seen driving by
the church several times.

Five days after Stewart disappeared, appellant
consented to the search of his apartment by the police.  During this search, the
police noticed newly painted areas as well as bleach spots throughout the
apartment.  They also observed that appellant’s bathroom was very clean and the
tile around the bathtub had been recently painted.  The police also found empty
bottles of ammonia, bleach, and peroxide in appellant’s apartment.  The police
conducted presumptive tests for possible DNA or blood evidence, which reacted
heavily in the bathroom.

The State also introduced evidence that appellant met
with Quanell X.  They went into the bathroom of his apartment where appellant
became nervous and told Quanell X he did not wish to talk in the bathroom.  Once
outside his apartment, appellant stated: “They going to kill me man…they going
to give me the death penalty.”  Appellant also cried but appeared comforted
after talking to Quanell X’s attorney on the telephone.  Eventually, appellant
agreed to show Quanell X where he had put Stewart.  As they were driving to
that location, appellant stated: “Ty [Stewart] lied to [me]” and “that bitch
used me.”  Eventually, appellant directed Quanell X’s vehicle to a dumpster
located inside an apartment complex.  The evidence shows that appellant then
walked up to the dumpster where, when asked if that was where he had put
Stewart’s body, responded, “Yes.”

The evidence also shows that after he was arrested,
appellant attempted to commit suicide.

The record also includes evidence that blood found on
a pair of jeans from appellant’s apartment was consistent with Stewart’s DNA
profile.  The evidence in the record also includes bone and enamel fragments
recovered from appellant’s garbage disposal.  The DNA profile from these bone
and enamel fragments was consistent with Stewart’s.  In addition, the DNA
profile from the evidence retrieved from between the boards of appellant’s
patio was also consistent with Stewart’s DNA.

Dr. Love testified that the bone fragments found
below appellant’s apartment patio had saw and/or knife marks and were
consistent with the thickness of human bones.  In addition, Dr. Love testified
that a bathtub could act like an autopsy table and if someone dismembered a body
in a bathtub, fluids from the body could be washed down the drain.  Dr. Love
also testified that even a small person could dismember a human body with a
handsaw.  Finally, Dr. Love testified that it was not easy for an untrained
individual to tell the difference between human and pig ribs.

Based on the totality of the foregoing, we hold the
evidence is sufficient for a rational jury to conclude that appellant, by a
manner and means unknown, intentionally caused Stewart’s death or intended to
cause her serious bodily injury that resulted in her death.  We overrule
appellant’s fourth issue.

V.        Did the trial
court err when it denied appellant’s motion to suppress because the affidavit
supporting the warrant was allegedly tainted by the inclusion of information
from appellant’s confession that appellant alleges was obtained in violation of
his constitutional and statutory rights to counsel?

            Appellant bases
his argument under his fifth issue on events that occurred following his arrest
next to the apartment dumpster.  After Sergeant Miller placed appellant under
arrest, he read appellant his Miranda[12]
warnings.  Eventually, appellant was taken to an interview room at the Sheriff
Department’s Lockwood Station.  On videotape, appellant told Sergeant Miller he
wanted to speak to an attorney before “help[ing] y’all close this case.” 
Appellant then told Sergeant Miller that his attorney was Stanley Schneider,
the same attorney he had spoken to when he was with Quanell X.  Sergeant Miller
stopped the interview and videotape at that point in time.

            Meanwhile,
Quanell X had called Schneider and asked him to meet appellant at the Lockwood
Station.  Because he was going to be delayed, Schneider sent another attorney,
Rob Fickman, to meet with appellant; however, Schneider arrived not long after
Fickman.  A confrontation occurred when Assistant District Attorney Siegler initially
prohibited both Fickman and Schneider from meeting with appellant because she
believed there was a conflict as Schneider had an ongoing professional
relationship with Quanell X, a likely witness at appellant’s trial. 
Eventually, Siegler relented and allowed Schneider to meet with appellant. 
Schneider met with appellant for approximately ten to fifteen minutes.  Quanell
X was also allowed to meet with appellant for a few minutes after appellant met
with Schneider.

            After these
meetings, Sergeant Miller began the administrative process of booking appellant
into jail.  At that point, appellant told Sergeant Miller he wanted to give his
statement without an attorney because he wanted to tell the truth.  Appellant
was then read his Miranda warnings a second time and represented he was
not coerced or forced to give a statement.  Appellant then gave his videotaped
confession.  Information from that confession was then used on the affidavit
supporting the Sheriff Department’s application for a search warrant for
appellant’s apartment.  Numerous items of evidence were then seized from
appellant’s apartment using that search warrant.

            Appellant’s fifth
issue begins with his contention that the State obtained his confession in violation
of his right to counsel under both the United States and Texas constitutions as
well as his right to counsel under article 38.23 of the Texas Code of Criminal
Procedure.  See U.S. Const.
amend. V; Tex. Const. art. I, §
10; Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005).  Appellant then argues
that the trial court erred when it denied his motion to suppress the evidence
seized from his apartment because the affidavit supporting the search warrant
contained information from this tainted confession.  According to appellant,
without the information from the allegedly tainted confession, the search
warrant lacked the requisite probable cause and was invalid under article 18.01
of the Texas Code of Criminal Procedure and therefore violated his federal and
state constitutional rights to be free from unreasonable searches and seizures. 
See U.S. Const. amend. IV;
Tex. Const. art. I, § 9; Tex.
Code Crim. Proc. Ann. art. 18.01(c) (West Supp. 2009) (providing that an
affidavit supporting a search warrant must set forth sufficient facts to
establish probable cause).

            A.        The
standard of review.

            We review a trial
court’s ruling on a motion to suppress under a bifurcated standard of review,
giving almost total deference to the trial court’s findings of historical fact
supported by the record and reviewing de novo the trial court’s application of
the law of search and seizure.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  The trial judge is the exclusive trier of fact and judge of the
credibility of the witnesses and the weight to be given their testimony at the
suppression hearing.  State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000).  As the trier of fact, the trial court is free to believe or disbelieve
all or any part of a witness’s testimony, even if the testimony is
uncontroverted.  Id.; Marsh v. State, 140 S.W.3d 901, 905 (Tex.
App.—Houston [14th Dist.] 2004, pet. ref’d).  In reviewing a trial court’s
ruling on a motion to suppress, an appellate court must view the evidence in
the light most favorable to the trial court’s ruling.  State v. Kelly,
204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When, as here, the trial court
fails to make explicit findings of fact, we imply fact findings that support
the trial court’s rulings so long as the evidence supports these implied
findings.  Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim. App.
2007).  If the trial court’s ruling is reasonably supported by the record and is
correct under any theory of law applicable to the case, the reviewing court
will sustain it upon review.  Villarreal v. State, 935 S.W.2d 134, 138
(Tex. Crim. App. 1996).

            B.        The
trial court did not abuse its discretion when it denied appellant’s motion to
suppress.

            The Fifth
Amendment right to counsel requires that once a suspect has expressed his
desire to deal with police only through counsel, he may not be subjected to
further interrogation until counsel has been made available to him, unless the
accused himself initiates further communication, exchanges or conversations
with the police.  Cross v. State. 144 S.W.3d 521, 526 (Tex. Crim. App.
2004).  A criminal suspect is deemed to have waived his previously-invoked
right to counsel only when (1) the suspect himself initiates further
communication with the police, and (2) after he re-initiates communication with
the police, the suspect validly waives his right to counsel.  Id. at
527.  Once this two-step waiver requirement is shown, the suspect has countermanded
his original election to speak to authorities only with the assistance of
counsel.  Id.  Thus, the critical inquiry is whether the suspect has
been further interrogated before he reinitiated conversations with law
enforcement officials.  Id. at 529.  If he has not, the Edwards
bright line rule is not violated.  Id.

Here, the record demonstrates that Sergeant Miller
ceased interviewing appellant once he invoked his right to counsel.  The record
further establishes that appellant was not approached again by the police until
Sergeant Miller began administrative booking procedures.  Approaching appellant
to carry out administrative booking procedures did not violate the Edwards
rule because these procedures are not considered custodial interrogations because
they do not normally elicit incriminating responses.  See id. at 524–25
n.5.  The record further demonstrates that during this process, appellant asked
Sergeant Miller if he wanted his statement.  When Sergeant Miller asked
appellant what he meant, appellant said “I want to give you a statement.” 
After Sergeant Miller explained that because appellant had invoked his right to
an attorney, he could not ask him any more questions without an attorney
present, appellant replied: “I wanted to give you a statement without an
attorney because I want to tell you the truth.  I’ll tell you my side of the
story.”  Finally, the record establishes that before starting his interview of
appellant, Sergeant Miller again read appellant his rights; asked appellant if
he wished to waive those rights; and appellant replied that he did.  We
conclude that the requirements of Edwards were met and that appellant’s
confession was not obtained in violation of his constitutional and statutory
right to counsel.  Since appellant’s confession was not obtained in violation
of his right to counsel, the probable cause affidavit supporting the search
warrant for appellant’s apartment was not tainted and the trial court did not
abuse its discretion when it denied appellant’s motion to suppress.  We
overrule appellant’s fifth and final issue.

Conclusion

            Having overruled
each of appellant’s issues on appeal, we affirm the trial court’s judgment. 

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices Anderson,
Frost, and Brown.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] The dumpster was
subsequently searched but Stewart’s remains were not found in the dumpster. 
After appellant confessed to murdering Stewart, the decision was made not to
conduct a search for Stewart’s remains in the landfill where the contents of
the dumpster had been taken.





[2] Appellant’s confession
was not introduced during the guilt/innocence phase of the trial.





[3] Dr. Love explained that
bones are made up of two different types of bone material: the thick cortical
bones in the center and spongy trabecular bone at the ends.





[4] According to Dr. Love,
antemortem trauma is trauma that occurs before death and that is revealed
because the bones show signs of healing.  In contrast, perimortem trauma occurs
after death and that is indicated by the lack of healing in the bone.





[5] Section 9.31 provides, in
pertinent part:

(a)        Except as provided in Subsection (b), a
person is justified in using force against another when and to the degree the
actor reasonably believes the force is immediately necessary to protect the
actor against the other’s use or attempted use of unlawful force.  The actor’s
belief that the force was immediately necessary as described by this subsection
is presumed to be reasonable if the actor:

(1)        knew or had reason to believe that the
person against whom the force was used:

(A)       unlawfully and with force entered, or was
attempting to enter unlawfully and with force, the actor’s occupied habitation,
vehicle, or place of business or employment;

(B)       unlawfully and with force removed, or was
attempting to remove unlawfully and with force, the actor from the actor’s
habitation, vehicle, or place of business or employment; or

(C)       was committing or attempting to commit
aggravated kidnapping, murder, sexual assault, robbery, or aggravated robbery;

(2)        did not provoke the person against whom the
force was used; and

(3)        was not otherwise engaged in criminal
activity, other than a Class C misdemeanor that is a violation of a law or
ordinance regulating traffic at the time the force was used….

(d)        The use of deadly force is not justified
under this subchapter except as provided in Sections 9.32, 9.33, and 9.34….

Tex. Penal Code Ann. § 9.31 (West Supp. 2009).





[6] Dr. Love testified that a
toolmark is a mark that is left on bone by an instrument such as a saw or a
knife.  





[7] Dr. Love also testified
that, prior to joining the Harris County Medical Examiner’s Office, she had
replaced Dr. Sims as the head forensic anthropologist at the Shelby County
Medical Examiner’s Office in Memphis, Tennessee.





[8] Kelly v. State,
824 S.W2d 568, 573 (Tex. Crim. App. 1992).  The factors found in Kelly
include: (1) the extent to which the underlying scientific theory and technique
are accepted as valid by the relevant scientific community, if such a community
can be ascertained; (2) the qualifications of the expert testifying; (3) the
existence of literature supporting or rejecting the underlying scientific
theory and technique; (4) the potential rate of error of the technique; (5) the
availability of other experts to test and evaluate the technique; (6) the
clarity with which the underlying scientific theory and technique can be explained
to the court; and (7) the experience and skill of the person(s) who applied the
technique on the occasion in question.  Id.





[9] There are also two
volumes of exhibits stretching 741 pages and holding more than 250 exhibits.





[10] Nonetheless, this does
not alter the constitutional authority of the intermediate courts of appeal to
evaluate and rule on questions of fact.  See Tex. Const. art. V, § 6(a) (“[T]he decision of [courts of
appeal] shall be conclusive on all questions of fact brought before them on
appeal or error.”) 





[11] “Serious bodily injury”
means “bodily injury that creates a substantial risk of death or that causes
death, serious permanent disfigurement, or protracted loss or impairment of the
function of any bodily member or organ.”  Tex. Penal Code Ann. § 1.07(46) (West
Supp. 2009).





[12] Miranda v. Arizona,
384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).